## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

MATTHEW C. POULIN,

      Plaintiff,

v.                                Case No: 8:21-cv-1516-WFJ-AEP

KEITH BUSH, et al.,

      Defendants.

_____

### ORDER

This matter comes before the Court on Defendants' Motions for Summary Judgment.[1] Plaintiff has responded in opposition, and Defendants have replied.[2] Upon careful review of the record, the Court grants-in-part and denies-in-part the Defendant Officers' Motions and grants the City's Motion.

### BACKGROUND

#### I.    The Arrest

This dispute arises out of the Defendant Officers' arrest of Plaintiff Matthew Poulin. On the night of October 15, 2017, Mr. Poulin's neighbor, Elana Wright-Hampton, called 911 to report that Mr. Poulin had entered her home and was "going

---

[1] The moving Defendants are the City of North Port, Florida (the "City") (Dkt. 61) and six police officers from the City of North Port Police Department: Officer Keith Bush (Dkt. 56), Officer Chad Walker (Dkt. 57), Officer John Mike Hetteberg (Dkt. 58), Officer Mathew Lagarce (Dkt. 59), Officer Stephen Cambria (Dkt. 60), and Officer John Contorno (Dkt. 65) (collectively, the "Defendant Officers").

[2] Plaintiff collectively responds to the Defendant Officers' motions (Dkt. 73) and individually responds to the City's motion (Dkt. 75). Similarly, the Defendant Officers filed a collective reply (Dkt. 80), while the City replied separately (Dkt. 81).

crazy." Dkt. 68. In a recording of the 911 call, Mrs. Wright-Hampton can be heard pleading with Mr. Poulin to stay away from her children while she attempts to shepherd Mr. Poulin to a different area of her house. *Id.* Mr. Poulin can also be heard in the background of the call before it dropped.

By the time the 911 operator reestablished contact with Mrs. Wright-Hampton, Mr. Poulin had exited her home. *Id.* The 911 operator continued her efforts to gather information, but Mrs. Wright-Hampton was panicked. *Id.* Mrs. Wright-Hampton managed to reaffirm that Mr. Poulin was outside and that "he is a danger." *Id.* She again implored the 911 operator for police assistance. *Id.* The 911 operator assured Mrs. Wright-Hampton that help was on the way and instructed her and her husband to remain inside their home until the police arrived. *Id.*

Soon thereafter, Defendant Officers Chad Walker and Keith Bush arrived on scene to find Mr. Poulin outside with his wife, Katherine Poulin.[3] After making contact with Mr. Poulin in the street,[4] Officer Bush walked away from Officer

---

[3] The entire encounter was captured by a home surveillance camera (Dkt. 30-2) and two police car dash cameras (Dkt. 30-1). While the videos are not of high quality, they provide the primary source of objective evidence concerning how the underlying events unfolded. When asked by counsel if "your recollection and what you're telling me comes from watching the video not your independent memory[,]" Mr. Poulin testified, "Yes. I was drinking that night. I was really messed up." Dkt. 73-11 at 44.

[4] Dana Cully, a neighbor present during the incident, offered the following deposition testimony:

> Immediately after officers arrived they approached, they walked up to Matt and they asked, you know, what seems to be going on, and, you know, it just started off as a normal conversation. Matt was standing say where I am and the two officers were standing directly in front of him, and I was standing right off back to the side a little bit because I kind of at that point, that's -- I don't want to get

2

Walker to speak with Mrs. Poulin and a second neighbor. Dkt. 30-1. Dash cam video then shows Mr. Poulin slowly meandering towards Officer Walker[5] before veering off of the street and stumbling up his inclined yard. *Id.* Officer Walker followed closely behind Mr. Poulin. *Id.*

Upon regaining his footing approximately halfway up his yard, Mr. Poulin stopped and turned towards Officer Walker. *Id.* The two briefly exchanged indiscernible words before Mr. Poulin tripped again, making physical contact[6] with Officer Walker as he stumbled down his yard towards the street. *Id.* Mr. Poulin caught himself on a trailer parked in the road. *Id.*

At this point, Officer Walker closed the distance and forcibly shoved Mr. Poulin into the trailer/onto the ground. *Id.*; Dkt. 30-2. Mr. Poulin landed in a small gully parallel to the parked trailer as Officer Walker mounted his back and attempted

---

involved in that, so I kind of stepped off to the back side, you know. And they were asking him what was going on and he just kept repeating the same stuff about his wife and this and that and, you know, not really -- unless, I guess, he had told you the whole story, you wouldn't know. It was like somebody telling you bits and pieces of a story, and when he was talking, he was -- he was animated.

Dkt. 73-1 at 15.

[5] Officer Walker testified that he had "asked Mr. Poulin to come to me to speak to me separately." Dkt. 73-17 at 49.

[6] Officers Bush and Walker allege that Mr. Poulin shoved Officer Walker, constituting battery on a law enforcement officer. Dkts. 73-2 at 41; Dkt. 73-17 at 52–53. This deposition testimony appears questionable in light of the video evidence, Dkts. 30-1 & 30-2, and the deposition testimony of Mr. Cully, who alleges that "[Mr. Poulin] might have brushed [Officer Walker's] uniform or the end of his fingers might have hit the officer's uniform because the officer was pretty close, you know, pretty close to him . . . [Mr. Poulin] didn't poke an officer. There's -- he didn't do that. The only thing that could have happened is his arm brushed up against him," Dkt. 73-1 at 16–17. Mr. Poulin also denied ever touching Officer Walker. Dkt. 73-11 at 44.

to handcuff him. Dkt. 30-2. Notwithstanding his position, Officer Walker claims that "he was unable to control [Mr. Poulin]." Dkt. 73-17 at 58. Officer Bush then approached with his taser drawn and "advised Officer Walker to get off of [Mr. Poulin]" so that Mr. Poulin could be tased. *Id.*; Dkt. 73-2 at 44.[7] Officer Walker obliged.

When Mr. Poulin rolled onto his back and attempted to sit up, Officer Bush discharged his taser for the first time, causing Mr. Poulin to experience a five-to-seven second period of neuromuscular incapacitation ("NMI"). Dkt. 30-2. When Mr. Poulin attempted to sit up again, he was tased a second time. *Id.* And, when Mr. Poulin failed to roll onto his stomach per Officers Bush and Walker's alleged commands, he was tased a third time. *Id.* According to Officer Bush's "Response to Resistance Report," NMI was achieved upon each taser discharge. Dkt. 73-14 at 3. In the same report, Officer Bush claimed that each time Mr. Poulin recovered from NMI, he sat up and screamed "Fuck You" before refusing to lay down.[8] *Id.*

---

[7] The level of Mr. Poulin's resistance at this point is unclear from the video evidence. Multiple accounts nevertheless suggest that Mr. Poulin failed to surrender his hands. For example, Mr. Cully stated that "when [Officer Walker] knocked him down and [Plaintiff] went on his stomach, his right arm went under his body. So the only extremity from his body that was moving was his left hand, and they were trying to grab his left hand and get his left hand behind his back, which wasn't working." *Id.* at 19. Officer Walker makes similar claims. *See* Dkt. 73-13 at 58.

[8] At his deposition, Mr. Poulin stated, "I might have been like 'what the fuck, what the fuck.' Shocked that I was struck by the other officer. I was mad that he had ripped my neckless off my neck. So I was -- I'm sure I was screaming obscenities to him." Dkt. 73-11 at 49.

Eventually, Mr. Poulin was able to sit up as Officers Bush and Walker stood back. Dkt. 30-1; Dkt. 30-2. Officer Bush claims that he felt threatened by "[t]he act of [Mr. Poulin] resisting and not complying with any of his lawful commands, and then getting a taser used on him and it [having no effect.]" Dkt. 73-2 at 50. Officer Walker expressed a similar sentiment in his deposition, explaining that, on top of Mr. Poulin's "total failure to comply" and "active resistance," Mr. Poulin's dog was freely running around while numerous onlookers stood in close proximity to the arrest. Dkt. 73-17 at 60.

Meanwhile, Defendant Officers Matthew Lagarce and John Contorno arrived on the scene as backup. Dkt. 30-1; Dkt. 73-20 at 25. Mr. Poulin can be seen on video sitting upright with his legs spread in front of him as Officers Bush and Walker attempt to gain his compliance through a verbal exchange. Dkt. 30-2. Mr. Poulin did not comply with their commands. *Id.* Officer Lagarce claims that "[Mr. Poulin] was saying, '[f]uck you, come get me.' He was yelling . . . [and] making odd noises." Dkt. 73-16 at 17. Officer Lagarce further described Mr. Poulin's behavior as "something that I've never experienced." *Id.* at 18.

According to Mrs. Poulin, who witnessed her husband's interaction with the officers, Officer Bush then told Officer Walker to "go get the dog." [9] Dkt. 73-15 at

---

[9] Officer Bush denies that he told Officer Walker to get K-9 Dutch, asserting instead that "Officer Walker made the decision to pull out the K-9; I did not." Dkt. 73-2 at 55. During Mr. Poulin's deposition, there is discussion about a video with audio that confirms that Officer Bush instructed

18−19. Officer Walker departed to his vehicle to retrieve his K-9 "Dutch." Dkt. 73-17 at 64; Dkt. 30-2. Approximately thirty seconds passed from the time Officer Walker left Mr. Poulin's presence to the time he returned with Dutch. Dkt. 30-2. During this period, Mr. Poulin—still seated upright—can be seen waving his right arm communicatively while also verbally expressing something to the surrounding officers. *Id.*

Officer Walker released Dutch onto Mr. Poulin within three seconds of rejoining Officers Bush, Lagarce, and Contorno. *Id.* According to Mr. Poulin, he was never warned that Dutch was present or going to be released. Dkt. 73-11 at 49. Notwithstanding, Dutch immediately bit Mr. Poulin's right arm. Dkt. 30-2. When Mr. Poulin jerked back and attempted to push Dutch away,[10] Officer Bush kicked or struck Mr. Poulin in the face. *Id.* This sent Mr. Poulin onto his back. *Id.* Dutch then sprang forward to bite Mr. Poulin's right arm again. *Id.*

---

Officer Walker to retrieve Dutch. Dkt. 73-11 at 78. The Court is not in possession of any such audio recording.

[10] Officer Walker alleges that "When Dutch went into bite, [Mr. Poulin] struck him then grabbed him by the neck." Dkt. 73-22 at 4. The video evidence appears to show Mr. Poulin briefly attempting to push Dutch off of his arm. Dkt. 30-2. Mr. Cully's deposition testimony does not make mention of this moment: "[s]o they kept working the dog up, you know. So every time the dog would bite into his arm, he was getting – he was, you know, getting praised for it. So the dog was getting more and more into it and the dog latched onto his arm and them started shaking his arm." Dkt. 73-1 at 25.

Seizing Mr. Poulin by the right forearm, Dutch pulled Mr. Poulin's body forward and counterclockwise into a prone position.[11] *Id.* Simultaneously, the surrounding officers began striking Mr. Poulin in the head and drive stunning[12] him with their tasers. *Id.* Mr. Poulin's right arm was still locked in Dutch's mouth when he experienced the first round of blows. *Id.*; Dkt. 30-1.

All six Defendant Officers were present by the time Dutch was initially pulled away from Mr. Poulin. Dkt. 30-1. Due to Mr. Poulin's position and the positions of the Defendant Officers surrounding him, however, the video evidence does not clearly show what happened next. *Id.* Officer Walker testified that, "Officer Bush was able to secure [Mr. Poulin's] free arm . . . I removed Dutch. After that, he was able to break there and tuck his arm back under him." Dkt 73-17 at 69.

As Mr. Poulin allegedly recoiled his left arm under his body, an officer on Mr. Poulin's back can be seen delivering another round of closed fist blows to Mr. Poulin's head. Dkt. 30-1. Others stunned him with their tasers. *Id.* Still, the Defendant Officers testified that they could not secure handcuffs on Mr. Poulin. *Id.*; Dkt. 30-2; Dkt. 73-22 at 4.

---

[11] Officer Walker alleges that, "[o]nce Dutch was on the bite I pulled [Mr. Poulin] into a prone position so Officer Bush could handcuff his free arm." Dkt. 73-22 at 4. This is inaccurate. The Defendant Officers did not attempt to push or pull Mr. Poulin until Dutch had already pulled him into a prone position by his arm. Dkt. 30-2.

[12] Drive stunning occurs when an officer "uses the stun method of the taser on[] a specific portion or place on a person's body[.]" Dkt. 73-3 at 94.

Officer Walker consequently "moved Dutch back in for another bite." Dkt. 73-22 at 4; Dkt. 30-2. In the excitement, though, Dutch accidently bit Officer Bush. Dkt. 73-22 at 4; Dkt. 30-2. Officer Walker immediately removed Dutch from Officer Bush and again commanded Dutch to bite Mr. Poulin. Dkt. 73-22 at 4; Dkt. 30-2. Dutch did so. Dkt. 30-1. The Defendant Officers were then able to get Mr. Poulin into a position from which they could remove Dutch and properly handcuff Mr. Poulin. *Id.*

The Defendant Officers restrained Mr. Poulin's legs and put a spit mask over his face.[13] *Id.* Mr. Poulin was subsequently transported to North Port Emergency Room where an assessment revealed "multiple severe lacerations to the right forearm [and] . . . extensive soft tissue defect to the right forearm [] along with multiple small puncture wounds." Dkt. 73-30 at 8. Mr. Poulin's toxicology screening returned positive results "for cocaine and THC as well as [an] elevated ETOH level."[14] *Id.* He spent around sixteen days recovering in the hospital. Dkt. 73 at 16.

## II.    Preceding Events

Prior to Mr. Poulin's arrest, the City of North Port faced multiple lawsuits for the alleged use of excessive force by the North Port Police Department's (the

---

[13] According to Officer Lagarce, Mr. Poulin was spitting while being taken into custody. Dkt. 73-16 at 42. Spitting cannot be seen on the video and is not otherwise found in the record. Mr. Poulin was not charged with battery.

[14] Mr. Poulin testified that he did not use cocaine on the night of the incident (Sunday, October 15, 2017) but "[p]robably that Friday or -- Thursday or Friday before the weekend[.]" Dkt. 73-11 at 27. This point is not challenged by the Defendant Officers.

"Department") K-9 unit.[15] At least four of these lawsuits revolved around the purported actions of Officer Bush.[16] And a substantial amount of negative media attention followed.[17]

"Based on news articles and lawsuits," Police Chief Kevin Vespia implemented an Inspector position and hired Steve Uebelacker to fill the role. Dkt. 73-3 at 77, 88. Mr. Uebelacker had multiple years of experience in law enforcement and previously served as Sarasota County's Ethics and Compliance Officer before becoming the Department's Inspector. Dkt. 73-5 at 10−13.

Concerning his impression of the Department, Mr. Uebelacker testified that, "if you weren't liked [by others at the Department], they would come after you . . . . But if you were liked, you were untouchable." Dkt. 73-5 at 45. Mr. Uebelacker further explained that when "an officer did something wrong," the Department

---

[15] A complete list of related actions can be found in Plaintiff's Amended Notice of Related Actions (Dkt. 10).

[16] *See Drake v. City of North Port* (8:15-CV-1672-T-26TBM); *Langston v. City of North Port* (8:14-CV-2592-JDW-EAJ); *Landon v. City of North Port* (8:15-CV-2272-CEH-JSS); *Lemay v. Dietz* (8:16-CV-504-MSS-AAS).

[17] *See* Dkt. 73-6. According to the Sarasota Herald-Tribune, during the previous five years, approximately "37 percent of apprehensions made by the [City's] K-9 unit ended with a dog attack." *Id.* at 23. The Sarasota Herald-Tribune also reported that the City's "K-9 handlers commanded their police dogs to attack more people from 2010 through 2014 than did the police K-9 handlers of neighboring municipalities Sarasota, Bradenton, Palmetto, Venice, and Punta Gorda combined[.]" *Id.* The Sarasota Herald-Tribune claims that its investigation consisted of a) analyzing five years of government reports documenting K-9 bites in the City and surrounding cities, b) documenting the bite ratios of the City's police department and individual K-9 handlers by reviewing more than 2,500 pages of Field Contact reports from the City, and c) consulting an independent police K-9 researcher to determine which cases to include/exclude in calculating bite ratios. *Id.* at 20.

"would investigate it" but "wouldn't go back and follow it up" with more training. *Id.* at 47. Relatedly, Mr. Uebelacker testified that "there was a couple of units [within the Department] that had minimal supervision, K-9 being one of them." *Id.* at 57.

While at the Department, Mr. Uebelacker states that he spent about "a year or two" reviewing "every K-9 bite" at the request of Chief Vespia. *Id.* at 19−21, 34−35. Mr. Uebelacker testified that this assignment came after Chief Vespia became "really shaken up" by a legal proceeding related to a K-9 bite incident. *Id.* at 19, 35. During this period, Mr. Uebelacker brought to Chief Vespia's attention past incidents of K-9 bites that Mr. Uebelacker found to be concerning. *Id.* at 35−36. Mr. Uebelacker testified that Chief Vespia "defended a lot of the actions" and never called for the re-opening of investigations into those bite incidents. *Id.* at 37−38.

A member of the K-9 unit who was of particular concern to Mr. Uebelacker was Officer Bush, whom Mr. Uebelacker described as having both a "propensity for violence" and a K-9 "with a reputation of a lot of bites." *Id.* at 39, 58−59. Mr. Uebelacker stated that, in or around 2016, the entire command staff voted Officer Bush out of the K-9 unit—a decision that Mr. Uebelacker attributes to Officer Bush's K-9 handling. *Id.* at 41; Dkt. 73-2 at 12. According to Chief Vespia and Officer Bush, however, Officer Bush was removed from the K-9 unit for policy violations unrelated to his use of force as a K-9 officer. Dkt. 73-2 at 13; Dkt. 73-3 at 77−78. Following his removal from the K-9 unit, Officer Bush was made a K-9 training

officer. Dkt. 73-2 at 11–12.

On February 7, 2017, Mr. Uebelacker met with Chief Vespia to discuss a number of unresolved issues that Mr. Uebelacker had purportedly identified while working at the Department, including his concerns about Officer Bush's new role as a K-9 training officer. *See* Dkt. 73-39 at 2–4. Two weeks later, Chief Vespia informed Mr. Uebelacker that he would begin employment termination procedures if Mr. Uebelacker did not resign from his position with the Department. *Id.* at 4.

Mr. Uebelacker and Chief Vespia offer competing accounts of their February 7th meeting and the reason for Mr. Uebelacker's termination. *See id.* at 2–11. In a memorandum sent to Chief Vespia after the termination discussion, Mr. Uebelacker wrote:

> As you recall, I brought the following issues to your attention during [the February 7th] meeting:
> . . . .
> Concerns that after several sustained complaints regarding K-9 Officer Bush, he was removed from K-9 and was made the K-9 trainer and was promised to return to K-9 in a year. You advised me that you told him that "if he kept his nose clean for a year, you would put him back." I reminded you of our conversations of Officer Bush's propensity for violence and the recommendations of the entire command staff to remove him from K-9. I reminded you of your concerns regarding the lack of discretion demonstrated by Officer Bush and your statement that "just because you can doesn't mean you should."

*Id.* at 2–3.

In a subsequent memorandum, Chief Vespia maintained that "[t]he statements

made by Captain Uebelacker [are] inaccurate." Dkt. 73-39 at 7. Chief Vespia wrote that Mr. Uebelacker's concern about the Department's handling of Officer Bush was an "example of Captain Uebelacker's intolerance for an opinion different than his own." *Id.* at 7−8. Chief Vespia emphasized that the Department "take[s] excessive force violations seriously" and would be hiring an external use of force expert later that year. *Id.*

Chief Vespia's memorandum also made note of the fact that Mr. Uebelacker had never made a written request for any investigation into excessive use of force by Officer Bush. *Id.* at 7. Mr. Uebelacker admitted that he had never made such a request. Dkt. 73-5 at 88. Moreover, when Mr. Uebelacker was asked during his deposition if he had "any knowledge about sustained complaints against [Officer] Bush and other K-9 officers," Mr. Uebelacker replied, "Not specifically. I mean . . . I do not specifically know that. As far as dog bites, I don't know if I know any of those." Dkt. 73-5 at 26−27. Mr. Uebelacker further clarified that though he had reviewed *past* incidents of K-9 bites, no K-9 bites had occurred during his time as Inspector. *Id.* at 85−86.

Chief Vespia's memorandum also outlined the decision to terminate Mr. Uebelacker's employment following the February 7th meeting. Dkt. 73-39 at 5−11. The memorandum highlighted several reasons for termination unrelated to Mr. Uebelacker's concerns regarding Officer Bush. *Id.* Chief Vespia explained that Mr.

Uebelacker had been the subject of complaints from staff, which prompted an internal inquiry that led to Mr. Uebelacker's receipt of "a memorandum for counseling for violation of courtesy and respect." *Id.* at 5. According to Chief Vespia, Mr. Uebelacker "could not move past being counseled" and "began to promote negativity and disruption throughout the agency," which was "problematic, concerning, and unacceptable, especially at [Mr. Uebelacker's] management rank[.]" *Id.*

Eight months after the February 7th meeting, Officer Walker released K-9 Dutch onto Mr. Poulin. At the time, Officer Bush was responsible for Officer Walker's K-9 training. Dkt. 73-17 at 20−21.

### III.   Procedural History

On September 9, 2021, Mr. Poulin filed his Second Amended Complaint. Dkt. 30. Therein, Mr. Poulin brings fourteen causes of action: Counts I−VI allege 42 U.S.C. § 1983 excessive force claims against the Defendant Officers in their individual capacities, *id.* at 12–19; Counts VII−XII allege § 1983 failure to intervene claims against the Defendant Officers in their individual capacities, *id.* at 20–26; Count XIII alleges a § 1983 excessive force claim against the City, *id.* at 27; and Count XIV alleges a negligent retention and supervision claim against the City concerning Officer Bush, *id.* at 31.

On September 23, 2021, Defendants filed separate answers with affirmative defenses. Dkts. 35−41. Each Defendant now moves for summary judgment. Dkts. 56−61, 65.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996). An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.*

The moving party bears the initial burden of identifying those portions of the record demonstrating the lack of a genuinely disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If met, the burden shifts to the non-moving party to "come forward with specific facts showing that there is a genuine issue for trial." *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018) (citation omitted). To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving

party must go beyond the pleadings and "identify affirmative evidence" that creates a genuine factual dispute. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).

In determining whether a genuine dispute of material fact exists, the Court must view the evidence and draw all factual inferences therefrom in a light most favorable to the non-moving party. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). In addition, the Court must resolve any reasonable doubts in the non-moving party's favor. *Id.* Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita*, 475 U.S. at 587.

## DISCUSSION

### I. The Defendant Officers' Motions

In each of their motions, the Defendant Officers maintain that:

> As a matter of law, [the Defendant Officers] [are] entitled to qualified immunity because [they] did not violate [Mr. Poulin's] clearly established constitutional rights. Further, the force utilized by [the Defendant Officers] in response to a felony suspect actively resisting arrest, after repeated commands to comply and who could not be subdued despite the physical efforts of multiple officers and the use of taser, was reasonable and appropriate and not excessive. In addition, as none of the [Defendant Officers] used excessive force against [Mr. Poulin], there can be no failure to intervene. Therefore, final summary judgment should be entered in the [Defendant Officers'] favor.

*See, e.g.*, Dkt. 56 at 3. The Court will begin by considering the Defendant Officers'
entitlement to qualified immunity, which necessarily subsumes their averments that
they did not use excessive force.

### a.  Qualified Immunity for Excessive Force

"Qualified immunity offers complete protection for individual public officials
performing discretionary functions insofar as their conduct does not violate clearly
established statutory or constitutional rights of which a reasonable person would
have known." *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012)
(citations and internal quotations omitted). It follows that, to receive qualified
immunity, an official must first "establish that he or she acted within the scope of
discretionary authority when the allegedly wrongful acts occurred." *Robinson v.
Sauls*, 46 F.4th 1332, 1340 (11th Cir. 2022) (citations and internal quotations
omitted). Once this showing is made, the burden shifts to the plaintiff to show that
(1) the defendant violated a constitutional right, and (2) this right was clearly
established at the time of the alleged violation. *Id.* at 1340–41.

There is no dispute that the Defendant Officers acted within the scope of their
discretionary authority when they arrested Mr. Poulin. Mr. Poulin also "agrees for
the purposes of this motion response, that [Officers Bush and Walker] had a right to
arrest him, and a right to utilize the taser the first time[.]" Dkt. 73 at 35. Mr. Poulin

nevertheless argues that "the force used and the injuries inflicted to [him] after the first tasering" violated his Fourth Amendment rights. *Id.* at 36.

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) (citation omitted). "In assessing reasonableness, we judge the officer's use of force on a case-by-case basis from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Robinson*, 46 F.4th at 1341 (citation and internal quotations omitted). Case-specific facts that courts consider generally go towards three determinations: "(1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." *Draper v. Reynolds*, 369 F.3d 1270, 1277–78 (11th Cir. 2004) (citations omitted). Ultimately, the analysis is a "balancing of competing interests" that uses these determinations to ascertain whether "the totality of the circumstances" justifies the particular use of force. *See Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985).

The need for application of force is measured by the factors set forth in *Graham v. Connor*, 490 U.S. 386 (1989). These factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade by flight." *Id.* at 396.

*Officer Bush's Taser Deployments*

Officers Bush and Walker were dispatched to Mrs. Wright-Hampton's address with information that there was a burglary in progress. Dkt. 56 at 4; Dkt. 57 at 4. Whether the 911 operator passed on any additional information that she gathered from Mrs. Wright-Hampton prior to Officer Bush and Walker's arrival—such as the fact that Mr. Poulin was unarmed and had exited Ms. Wright-Hampton's home after drinking a glass of water—is unclear.[18] Dkt. 68. It is clear, however, that no burglary was in progress by the time Officers Bush and Walker arrived to find Mr. Poulin outside. It also appears that neither Officer Bush nor Officer Walker initially considered Mr. Poulin to be an immediate threat to their safety or the safety of others. Dkt. 30-1. Otherwise, Officer Bush would not have promptly stepped away to speak with Mrs. Poulin and a neighbor, leaving Officer Walker to handle Mr. Poulin alone.

---

[18] This lack of clarity stems from the differing testimonies of Officers Walker and Bush. When Officer Walker was asked about the information he possessed when arriving at the scene, he responded that "[t]he subject broke into a house, and that's what we responded to, a burglary in progress. That's what we needed to know." Dkt. 73-17 at 48. When Officer Bush was given a similar line of questioning, he answered somewhat differently:

> Q: And the report was that he had like walked into somebody's house and gotten a glass of water, right? And then walked out?
> A: Well, he -- he had broken into somebody's house yes, and was drinking water in their house.

Dkt. 73-2 at 60.

All the same, the Court's need for force analysis must reflect the rapidly changing circumstances of Mr. Poulin's arrest. *See Graham*, 490 U.S. at 396–97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."). The first significant change of circumstances occurred when Mr. Poulin stumbled and made physical contact with Officer Walker. Officers Bush and Walker claim that this contact constituted battery on a law enforcement officer. Dkt. 73-2 at 41; Dkt. 73-37 at 37. Mr. Poulin disagrees based on the video evidence.

When "opposing parties tell two different stories, one of which is blatantly contradicted by the record [as with a video recording of the incident], so that no reasonable jury could believe it, a court should not adopt that version of the facts." *Robinson*, 46 F.4th at 1340 (citations and internal quotations omitted) (alteration in original). Here, the video evidence and witness testimony in the record strongly suggest that Mr. Poulin unintentionally brushed against Officer Walker as Mr. Poulin stumbled down his inclined yard. Dkt. 30-2; Dkt. 73-1 at 16–17. It is also true that Mr. Poulin was never prosecuted for battery. Dkt. 73-36 at 3.

Be that as it may, the Court cannot say that the record contradicts Officers Bush and Walker's version of the facts to the extent that *no* reasonable jury could

believe it. Regardless of his actual intentions, Mr. Poulin's arms extended and made physical contact with Officer Walker's torso as Mr. Poulin stumbled toward the street. Dkt. 30-1. This sequence of events transpired in mere seconds. And, based on the Defendant Officers' testimony and the video evidence in the record, a reasonable jury could conclude that Mr. Poulin intended to make physical contact with Officer Walker. *See Robinson*, 46 F.4th at 1340.

It is also important to reiterate that, for the purposes of a qualified immunity analysis, the facts as established by the evidence taken in a light most favorable to Mr. Poulin are to be viewed "from the perspective of a reasonable officer on the scene." *See Mathews v. Wetherbee*, 839 F. App'x 395, 397 (11th Cir. 2020) (citation omitted). For the reasons explained above, a reasonable officer on the scene could have considered Mr. Poulin's physical contact with Officer Walker to be intentional. This was a rapidly evolving situation.

Accordingly, although the Court may retrospectively disagree with Officers Bush and Walker's on-site determination, the Court must treat Mr. Poulin's physical contact with Officer Walker as a battery on a law enforcement officer when considering the severity of the crimes at issue. *See Graham*, 490 U.S. at 396 (explaining that "[t]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight"). This means that the three crimes at issue when the first

challenged use of force occurred (i.e., Officer Bush's second taser deployment) were burglary, battery on a law enforcement officer, and resisting arrest without violence. These are objectively serious crimes.

As the Supreme Court has noted, however, "the fact that an unarmed suspect has broken into a dwelling at night does not automatically mean he is physically dangerous." *Garner*, 471 U.S. at 21. By all accounts, Mr. Poulin's "burglary" amounted to a theft of water from Ms. Wright-Hampton's refrigerator.[19] Mr. Poulin's "battery on a law enforcement officer" amounted to Mr. Poulin brushing against Officer Walker's torso as he stumbled down his yard. And Mr. Poulin's resistance amounted to tucking his arms under his body. Of course, this is not to suggest that Ms. Wright-Hampton's ordeal was trivial, that Mr. Poulin's alleged crimes were minor, or that Mr. Poulin's alleged crimes had no bearing on the immediate threat posed by Mr. Poulin from the perspectives of Officers Walker and Bush. Rather, it is to make clear that the crimes at issue did not inherently bleed into the remaining *Graham* factors so as to render Mr. Poulin an ongoing immediate threat irrespective of any change in circumstance.

This point is relevant for two reasons. First, the circumstances had changed following Officer Bush's first taser deployment. Mr. Poulin was essentially lying in

---

[19] When asked at her deposition what Mr. Poulin did after entering her home, Ms. Wright-Hampton testified that, "[h]e came in and he drank some water and -- he walked right in and walked -- drank water and left." Dkt. 73-12 at 12.

a small gully, unarmed and dazed from NMI, as two police officers stood on higher ground to his right and a trailer remained parked on higher ground to his left. Any immediate threat of bodily harm posed by Mr. Poulin was minimal. Beyond allegedly "shoving" Officer Walker while stumbling down his yard, Mr. Poulin did not attempt to physically engage with anyone. Second, in relation to his second and third taser deployments, Officer Bush fails to explain how Mr. Poulin posed a continued immediate threat beyond reiterating that "[Mr. Poulin] had committed occupied burglary, a serious and dangerous crime. [Mr. Poulin] physically and actively resisted arrest, shoving Officer Walker, screaming profanities at and otherwise antagonizing officers, and trying to push off the ground. [Mr. Poulin] refused to comply with the officers' verbal commands and could not be subdued[.]" Dkt. 56 at 19. Even if these are fair characterizations, these events all happened *before* Officer Bush tased Mr. Poulin the first time. The Court is therefore left to assume that, as Officer Bush says, "[I] only tased [Mr. Poulin] more than once because the first and second deployment seemed to have no effect." *Id.* This speaks to Mr. Poulin's active resistance, not his current threat.

That said, it is not clear that this final *Graham* factor weighs so strongly in Officer Bush's favor. Indeed, viewing the evidence in a light most favorable to Mr. Poulin, Mr. Poulin's post-NMI behavior represents something closer to NMI recovery than active resistance. Approximately 12-to-14 seconds passed between

22

Officer Bush's first and second taser deployments. Dkt. 30-2. Mr. Poulin spent around 5-to-7 seconds of this time in NMI. *Id.* Approximately 10 seconds passed between Officer Bush's second and third taser deployments. *Id.* Mr. Poulin spent around 5 seconds of this time in NMI. *Id.* This means that Mr. Poulin had two 5-to-6 second periods to orientate himself, roll over, and submit himself to handcuffing after being shocked into incapacitation by each taser deployment. Assuming that Mr. Poulin took 1-to-2 seconds to regain basic mental functioning after each NMI, Officer Bush effectively gave Mr. Poulin less than 5 seconds to comply before deploying his taser the second and third times. Whether Mr. Poulin could or did actively resist arrest during these brief periods strikes the Court as a question better left to the trier of fact.

In any event, there was a continued need for the application of force. Serious crimes were at issue and Mr. Poulin posed a legitimate—albeit limited—threat. Officer Bush, moreover, could have reasonably viewed Mr. Poulin's post-NMI attempts to sit upright as some form of active resistance. While such circumstances do not call for the highest level of force, they undoubtedly necessitate "some degree of physical coercion[.]" *Graham*, 490 U.S. at 396.

With the *need* for force established, the Court now turns to whether Officer Bush's second and third taser deployments constituted *reasonable* force. This objective determination is made by collectively considering the need for force, the

proportionality of the force used, and the extent of Mr. Poulin's injuries within the larger context of Mr. Poulin's arrest. *See Draper*, 369 F.3d at 1277–78.

Upon careful review of these considerations, the Court finds that Officer Bush's second and third taser deployments did not amount to a violation of Mr. Poulin's Fourth Amendment rights. There was a legitimate need for the application of force based on the crimes at issue, the possible threat posed by Mr. Poulin to Officers Bush and Walker, and Mr. Poulin's apparent failure to comply with Officers Bush and Walker's commands. Officer Bush's use of successive taser cycles in an attempt to gain Mr. Poulin's compliance was not disproportionate to this need or general purpose. Indeed, courts have found similar uses of force reasonable where police officers could not gain compliance—even when suspects were already handcuffed. *See Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306 (11th Cir. 2009) (finding no excessive force where a police officer discharged his taser three times on an already handcuffed suspect who continued to actively resist after repeated commands and taser deployments); *Buckley v. Haddock*, 292 F. App'x 791, 794 (11th Cir. 2008) (same).

In addition, the injuries caused to Mr. Poulin by Officer Bush's second and third taser cycles were temporary and minimal. Other than listing "multiple tazer [*sic*] wounds to back," Mr. Poulin's treating physicians appear to have been unconcerned about any injury related to Officer Bush's taser use. Dkt. 73-30 at 10.

Mr. Poulin also fails to allege that he sustained any serious or permanent injury therefrom. In sum, given the totality of the circumstances, the Court cannot find that Officer Bush's taser use was objectively unreasonable or unjustified.[20] It cannot serve as grounds for denying him qualified immunity.

### *Officer Walker's K-9 Use*

Whether the same can be said of Officer Walker's K-9 use presents a different question. As an initial matter, by the time Officer Walker released Dutch onto Mr. Poulin, the need for force was significantly diminished. At this point, the other Defendant Officers were on the scene. Mr. Poulin, still unarmed, was sitting upright in the small gully next to the parked trailer with his legs spread before him as five police officers stood on higher ground to his right.[21] Mr. Poulin was completely contained from the perspective of any reasonable officer on scene. Further, other than his alleged battery on Officer Walker (which no reasonable officer could have interpreted as an attempt to inflict injury beyond an unwanted touching), Mr. Poulin had not attempted to physically engage with anyone. Mr. Poulin also never attempted

---

[20] Plaintiff's suggestion that Officers Bush and Walker could have simply handcuffed Mr. Poulin during NMI does not change the Court's analysis. While that might have been a viable option, the Eleventh Circuit has explained that "[w]e do not sit in judgment to determine whether an officer made the best or a good or even a bad decision in the manner of carrying out an arrest. The Court's task is only to determine whether an officer's conduct falls within the outside borders of what is reasonable in the constitutional sense." *Buckley v. Haddock*, 292 F. App'x 791, 794 (11th Cir. 2008).

[21] Four of the Defendant Officers (Bush, Walker, Lagarce, and Contorno) were approximately five feet from Mr. Poulin, while one Defendant Officer (Cambria) was approximately ten-to-fifteen feet away. Dkt. 30-1.

to stand up or flee. In the time between Officer Bush's third taser deployment and Officer Walker's release of Dutch, Mr. Poulin simply remained seated on the ground.

The Court recognizes that Mr. Poulin displayed an agitated and aggressive tone during this period. It is worth noting, however, that Mr. Poulin is not accused of directly threatening anyone beyond yelling expletives. Dkt. 73-2 at 54. Shouting expletives and sitting up were the extent of his active resistance. From the perspective of any reasonable officer on scene, this conduct—which took place as Mr. Poulin remained seated in the small gully surrounded by multiple police officers and a parked trailer—could not transform Mr. Poulin into a great danger. Objectively, Mr. Poulin posed very little threat of immediate bodily harm to anyone. The remote possibility of Mr. Poulin having a weapon on his person, despite being shirtless and largely keeping his hands visible, does not change this fact.

This brings the Court to proportionality. As an initial matter, the use of a K-9 on a stationary, contained, and unarmed suspect represents a significant increase in force from the use of a taser. Tasers subdue suspects by temporarily incapacitating their nervous system through the measured release of electrical currents. K-9s, such as Dutch, subdue suspects by maiming their flesh through largely uncontrolled biting. That being the case, it is difficult to discern any balance between the need for force and the type of force used here.

At the time Dutch was ordered to bite, Mr. Poulin was in a controlled position surrounded by five officers and had not attempted to flee. Officer Walker also allowed Dutch to continue his attack on Mr. Poulin after Dutch had already pulled Mr. Poulin into a prone position *and* the Defendant Officers had begun striking Mr. Poulin and drive stunning him with their tasers. It is unclear to the Court how Mr. Poulin was to surrender his right arm to the officers while Dutch continued to bite it.[22] Any attempt by Mr. Poulin to pull his right arm behind his back as commanded likely would have caused Dutch to bite down more vigorously. And if the ultimate goal or need was to handcuff Mr. Poulin, there is no sense or proportionality in continuing to use a form of force that makes it impossible to effectuate handcuffing. This is not to mention that, after fully separating Dutch from Mr. Poulin, Officer Walker moved Dutch back in for another, second episode of biting.

Finally, unlike Officer Bush's taser deployments, Dutch caused significant and permanent physical injury. Mr. Poulin spent sixteen days in the hospital recovering from the severe lacerations and tissue defects he incurred from Dutch. Mr. Poulin's arm is permanently disfigured. It will never function the same.

---

[22] In similar cases, courts have reasoned that a jury could find it objectively unreasonable to require someone to put his hands up and calmly surrender while a police dog bites him. *See Carter v. Marion*, No. 7:12-CV-76 HL, 2013 WL 5220180, at *3 (M.D. Ga. Sept. 16, 2013) (agreeing with *Kopf v. Wing,* 942 F.2d 265, 268 (4th Cir.1991) that "a jury could find it objectively unreasonable to require someone to put his hands up and calmly surrender while a police dog bites his scrotum . . . or . . . his head, side, arm, and shoulder").

Given the totality of these circumstances, the Court finds that Officer Walker's use of K-9 Dutch was objectively unreasonable. Within three seconds of bringing Dutch to the site, Officer Walker released him onto an unarmed, seated suspect who was fully surrounded by officers. Mr. Poulin posed a minimal threat at worst. Viewing the evidence in a light most favorable to Mr. Poulin, he certainly posed no greater threat than he did at the time of Officer Bush's initial taser deployments. All the same, Dutch was allowed to attack Mr. Poulin repeatedly, even while the Defendant Officers punched Mr. Poulin and drive stunned him with tasers. The excessive nature of this K-9 use is evident from the video footage and third-party witness testimony contained in the record.[23] The lack of necessity is equally apparent. There is no doubt that the Fourth Amendment's guarantee of freedom from excessive force would ultimately mean very little if it did not encompass the right not to be attacked by a police K-9 in these circumstances.

The Court now turns to consider whether this constitutional right was clearly established at the time of the violation such that any reasonable officer would have

---

[23] Mr. Cully recounted:

> So every time the dog would bite into his arm, he was getting -- he was, you know, getting praised for it. So the dog was getting more and more into it and the dog latched onto his arm and then started shaking his arm. And at that point -- I watched that for probably about maybe three and a half/four minutes, and I was starting to really get disturbed by what I was seeing so I -- I departed at that point[.]

Dkt. 73-1 at 24–25.

known that this conduct violated the Fourth Amendment. *See Fils v. City of Aventura*, 647 F.3d 1272, 1287 (11th Cir. 2011). The Eleventh Circuit uses two methods to evaluate this issue. The first "looks at the relevant case law at the time of the violation; the right is clearly established if a concrete factual context [exists] so as to make it obvious to a reasonable government actor that his actions violate federal law." *Jay v. Hendershott*, 579 F. App'x 948, 951 (11th Cir. 2014) (citations and internal quotations omitted) (alteration in original). Under this method, the facts of the case do not need to be identical, but "the unlawfulness of the conduct must be apparent from pre-existing law." *Id.* (citations omitted).

"The second method looks not at case law, but at the officer's conduct, and inquires whether that conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the officer], notwithstanding the lack of fact-specific case law." *Id.* (citations and internal quotations omitted) (alteration in original). This method is referred to as the "obvious clarity" exception. *Id.* For the obvious clarity exception to apply, "the officer's conduct must have been so far beyond the hazy border between excessive and acceptable force that [the official] had to know that he was violating the Constitution even without caselaw on point." *Id.* (citations and internal quotations omitted) (alteration in original).

Pursuant to the first method, the Court finds that "no case from the Supreme Court, the Eleventh Circuit, or the Florida Supreme Court is 'on all fours' with the facts alleged in this case" so as to make it obvious to a reasonable government actor that this use of force violated federal law. *See id.* To begin, the instant case cannot reasonably be placed on either side of the K-9-based excessive force spectrum. This much is clear from the Eleventh Circuit's discussion in *Hendershott*:

> [A]t one end of the spectrum, we have previously held that the use of a police canine to subdue a suspect is objectively reasonable where the suspect is wanted for the commission of a serious crime, actively flees from police, resists arrest, and is reasonably believed to be armed and dangerous. *See Crenshaw v. Lister*, 556 F.3d 1283, 1292 (11th Cir.2009) (per curiam). By contrast, at the other end, we have held that such force, when employed against an individual who presents no safety risk and is fully compliant with officers' commands, is excessive under the Fourth Amendment. *See* [*Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 927 (11th Cir. 2000)].

*Id.* at 951–52 (citation omitted).

Unlike the plaintiff in *Crenshaw*, Mr. Poulin was not suspected of armed robbery, did not crash into a marked patrol car while fleeing, and did not subsequently flee on foot. 556 F.3d at 1286. Yet, Mr. Poulin was not docile or fully compliant with police commands like the plaintiff in *Priester* either. 208 F.3d at 927. Mr. Poulin's reliance on *Priester* is therefore misplaced.

It is also worth noting that cases in the middle of this spectrum do not support a finding that Officer Walker's K-9 use was a clearly established constitutional violation. In *Hendershott*, for instance, the plaintiff ignored an officer's commands

to pull over for a traffic stop and, instead, led officers on a low-speed chase ending at the plaintiff's home. 579 F. App'x at 949. "Although he displayed no outward hostility or violent behavior towards any of the officers," the plaintiff continued to ignore the officer's commands upon exiting his car and slowly walking toward his home's garage. *Id.* The defendant officer then released his K-9 onto the plaintiff. *Id.* Without deciding whether this use of force was actually excessive, the Eleventh Circuit concluded that there was no materially similar case law rendering the K-9's use *obviously* excessive such that a reasonable officer should have known that the use of force violated the Fourth Amendment. *Id.* at 951–53.

The Eleventh Circuit reached a similar conclusion in *Jones v. Fransen*, 857 F.3d 843 (11th Cir. 2017). There, the plaintiff fled after breaking into his ex-girlfriend's apartment and taking a television set. *Id.* at 848. During the search for the plaintiff, the defendant officer spotted the plaintiff lying at the bottom of a ravine after already having released his K-9. *Id.* The K-9 "savagely" attacked the plaintiff while he lay motionless, and the officer was unable to get his K-9 to release its bite for some time. *Id.* The incident "permanently disfigured and limited the use of [the plaintiff's arm]." *Id.* The Eleventh Circuit nevertheless found that these facts landed "somewhere between those involved in *Priester* and those in *Crenshaw*." *Id.* at 854. The court further found that, "as a result, neither case alone could have provided [the

defendant officers] with the type of 'fair notice' necessary to breach qualified immunity." *Id.*

The Court finds the same reasoning applicable here. There is simply no controlling and materially similar case that declares the use of K-9 Dutch in the underlying circumstances to be clearly unconstitutional. *See Priester*, 208 F.3d at 926 (11th Cir. 2000) (finding that, "[i]n the context of Fourth Amendment excessive force claims, we have noted that generally no bright line exists for identifying when force is excessive; we have therefore concluded that unless a controlling and materially similar case declares the official's conduct unconstitutional, a defendant is usually entitled to qualified immunity"). As a result, Mr. Poulin cannot rely on the first method of establishing a clear constitutional violation concerning Officer Walker's K-9 use. *See Cornett v. City of Lakeland*, No. 8:06-CV-02386-T-17-TBM, 2008 WL 2740328, at *9 (M.D. Fla. July 10, 2008) (finding that no case law clearly established a Fourth Amendment violation where a suspect surrendered himself during the execution of a felony arrest warrant only to be bitten multiple times by a police K-9).

Pursuant to the second method of analyzing clear establishment, "the Court must determine whether application of the excessive-force standard would inevitably lead every reasonable officer in [the Defendant Officers'] position to conclude that the force was unlawful." *Hendershott*, 579 F. App'x at 951 (citations

and internal quotations omitted). This "obvious clarity" exception is a narrow one. *Id.* As mentioned above, "[t]o fall within this exception, the officer's conduct must have been so far beyond the hazy border between excessive and acceptable force that [the official] had to know he was violating the Constitution even without caselaw on point." *Id.* (citations and internal quotations omitted).

The Court finds that Officer Walker's use of K-9 Dutch falls within this narrow exception. To be sure, this was not "the sort of 'split-second' determination made by an officer on the scene that *Graham* counsels against second guessing." *See Edwards v. Shanley*, 666 F.3d 1289, 1295 (11th Cir. 2012) (quoting *Graham,* 490 U.S. at 396–97). Rather, like the officers in *Chew v. Gates*, 27 F.3d 1432, 1443 (9th Cir. 1994),[24] Officer Walker "had ample time to consider [his] tactics in apprehending the suspect[.]" *Mongeau v. Jacksonville Sheriff's Off.*, 197 F. App'x 847, 851 (11th Cir. 2006) (differentiating the subject fact pattern from that in *Chew*).

---

[24] The Ninth Circuit's decision in *Chew v. Gates*, 27 F.3d 1432 (9th Cir. 1994) was considered by the Eleventh Circuit in *Mongeau v. Jacksonville Sheriff's Off.*, 197 F. App'x 847, 851 (11th Cir. 2006). In *Chew,* the defendant officer's K-9 was released into a scrapyard where the plaintiff was known to have fled from police. 27 F.3d at 1436. The K-9 located the plaintiff behind two metal bins, prompting the plaintiff to yell for officers to call off the K-9. *Id.* The defendant officer did not immediately call off his K-9, which had already started to bite the plaintiff. *Id.* In assessing the defendant officer's qualified immunity claim, the Ninth Circuit held that the question of whether it was reasonable for the defendant officer to release the K-9 was a question that needed to be presented to a jury. *Id.* at 1443. Though the Eleventh Circuit did not indicate how it would have resolved the qualified immunity question in *Chew*, it emphasized several facts supporting the Ninth Circuit's holding. *Mongeau*, 197 F. App'x at 851. Among these facts was that the police in *Chew* had "ample time to consider their tactics" before releasing the K-9. *Id.*

Despite this ample time for consideration, Officer Walker decided to release K-9 Dutch on a non-fleeing, unarmed suspect who was sitting on the ground while surrounded by five police officers. Officer Walker then allowed Dutch to continue biting Mr. Poulin after Dutch had already pulled Mr. Poulin into a prone position and after the other Defendant Officers had begun drive stunning and striking Mr. Poulin with closed fists. Use of this force at this point was unnecessary.

In a case like *Hendershott,* where a K-9 was released upon the plaintiff as he walked toward an open garage against officers' commands following a low-speed chase, "officers had no way of knowing [the plaintiff's] purpose in going into the garage, whether weapons awaited him, or whether [he] intended to enter the house and possibly take hostages." 579 F. App'x at 953. In a case like *Cornett,* where the plaintiff surrendered himself during the execution of a felony arrest warrant only to be bitten by a police K-9, the defendant officer "had no way of knowing whether [the suspect] was armed" when she made the split-second decision to release her dog prior to the suspect stepping into her view. 2008 WL 2740328, at *10. In a case like *Mongeau*, where a K-9 was repeatedly released onto the plaintiff immediately following a high-speed car chase and collision, "the deployments of the dog to prevent [the suspect] from obtaining a weapon or fleeing [again] were reasonable under the circumstances." 197 F. App'x at 851.

The facts here differ. No reasonable officer on the scene could have thought that Mr. Poulin posed an immediate threat to anyone's safety from the gully in which he sat while surrounded by multiple police officers. Similarly, no reasonable officer on the scene could have thought that Mr. Poulin posed a flight risk. There was simply no need or purpose in twice releasing Dutch onto Mr. Poulin. This determination is underscored by the fact that Dutch was permitted to bite Mr. Poulin's arm while the Defendant Officers struck and drive stunned Mr. Poulin, making it more difficult— if not impossible—to effectuate the officers' goal of handcuffing their suspect.

Apart from that, a need to gain Mr. Poulin's compliance did not equate to a need to release a police K-9 under these circumstances. Officers' use of force to gain compliance was considered in *Piazza v. Jefferson County, Alabama*, 923 F.3d 947 (11th Cir. 2019). There, a correctional officer was attempting to transfer the plaintiff, a county jail inmate, to a padded cell when the plaintiff took off running down the hallway. *Id.* at 950. The plaintiff ran into a bathroom and grabbed a shower curtain, which the correctional officer was able to remove from his possession. *Id.* Another correctional officer then arrived on the scene, and both officers unsuccessfully attempted to pull the plaintiff into his new cell. *Id.* One of the correctional officers then tased the plaintiff, causing the plaintiff to fall to the floor and urinate on himself. *Id.* Eight seconds later, the correctional officer tased the plaintiff again as he lay

motionless on the floor in his own urine. *Id.* The plaintiff went into cardiac arrest after the second tasing and later died at the hospital. *Id.*

Reviewing the district court's denial of qualified immunity, the Eleventh Circuit explained that, "[a]lthough officers may (of course) use force to 'preserve internal order and discipline' and 'maintain institutional security,' the severity of the problem and the corresponding risk to the officers in this case were—from the outset—exceedingly minimal." *Id.* at 955 (citations omitted). The court further noted that, "[a]lthough non-compliant, [the plaintiff] had neither threatened nor attempted to harm the officers." *Id.* Thus, while the Eleventh Circuit did not question the correctional officer's "split-second decision to deploy his taser once," there was "no legitimate basis for the second shock, particularly considering (1) that the first shock had immobilized [the plaintiff] and (2) the minimal threat to order, safety, and security that [the plaintiff] posed even from the outset." *Id.*

The same is true here regarding Officer Walker's K-9 use. Granted, Mr. Poulin was not fully incapacitated after Officer Bush's taser deployments. But he was unarmed, surrounded by officers, and seated on the ground with his legs spread before him. If anything, Mr. Poulin posed a minimal threat. And there was no legitimate basis for employing such a high, maiming level of force on him under these circumstances. The use of K-9 Dutch was disproportionate and unwarranted.

The Court does not discount the difficulties that police officers face in rapidly evolving and tense situations. The Court merely emphasizes that, when proceeding with ample time and control over a situation, officers must only resort to a form of force that is both proportionate to the threat before them and purposed to achieve their objectives (i.e., not counterproductive, like the subject K-9 use in effectuating Mr. Poulin's handcuffing). Force for the sake of force is unconstitutionally excessive by definition, and it is at the heart of what the Fourth Amendment aims to protect against. Because Officer Walker's use of K-9 Dutch essentially amounted to just that, the Court finds that this K-9 use was so far beyond the hazy border between excessive and acceptable force that Officer Walker must have known he was violating the Constitution, even without materially similar case law on point. *See Hendershott*, 579 F. App'x at 951. Officer Walker is not entitled to qualified immunity.[25]

---

[25] Beyond Officer Walker, Mr. Poulin contends that, due to the other use of force in this record, none of the other Defendant Officers are entitled to qualified immunity for excessive force. The Court disagrees. Lower courts may avoid consideration of the first qualified immunity prong and consider the second prong alone where the question of clear establishment is dispositive. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The question of clear establishment is dispositive in relation to the non-Walker Defendant Officers' other use of force. First, Mr. Poulin cannot show that the unlawfulness of the other Defendant Officers' employment of force was apparent from pre-existing case-law. *See Hendershott*, 579 F. App'x at 951. The Defendant Officers had probable cause to arrest Mr. Poulin and a right to use force. The case Mr. Poulin relies upon here, *Reese v. Herbert*, 527 F.3d 1253, 1273 (11th Cir. 2008) (finding no probable cause to arrest the plaintiff), is inapposite. The Court is unaware of any other case that would have made it obvious to the Defendant Officers that their use of force violated federal law. *See Hendershott*, 579 F. App'x at 951. Second, the narrow "obvious clarity" exception is similarly inapplicable. Officer Walker's excessive decision to release K-9 Dutch onto Mr. Poulin twice does not change the fact that the other Defendant Officers had a legal right and duty to effectuate Mr. Poulin's arrest. "Not only

**b. Qualified Immunity for Failure to Intervene**

It follows from the foregoing discussion concerning Officer Walker's excessive force that Defendant Officers Bush, Lagarce, Cambria, Contorno, and Hetteberg are, because of failure to intervene, "no more entitled to qualified immunity than Officer [Walker]." *Edwards*, 666 F.3d at 1298. As the Eleventh Circuit has explained,

> "[i]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation . . . takes place in his presence, the officer is directly liable under Section 1983." *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986). "This liability, however, only arises when the officer is in a position to intervene and fails to do so." *Priester v. City of Riviera Beach*, 208 F.3d 919, 924 (11th Cir. 2000). The principle that an officer must intervene when he or she witnesses unconstitutional force has been clearly established in this Circuit for decades. *Id.* at 927 ("That a police officer had a duty to intervene when he witnessed the use of excessive force and had the ability to intervene was clearly established in February 1994."). When an officer witnesses another officer's excessive use of force and makes "no effort to intervene and stop the ongoing constitutional violation[,] . . . [the witnessing officer] is no more entitled to qualified immunity than [the officer using force]." *Edwards v. Shanley*, 666 F.3d 1289, 1298 (11th Cir. 2012).

*Helm v. Rainbow City, Ala.*, 989 F.3d 1265, 1272 (11th Cir. 2021) (alterations in original).

---

does the right to make an arrest . . . necessarily carry with it the right to use some degree of physical coercion . . . but we also recognize that the typical arrest involves some force and injury." *Reese*, 527 F.3d at 1272 (citations and internal quotations omitted). The force the other Defendant Officers employed in handcuffing Mr. Poulin was not so far beyond the hazy border of excessive and acceptable force here that they had to know that they were violating the Constitution even without caselaw on point.

Each of the Defendant Officers were present when Officer Walker either first released Dutch onto Mr. Poulin or then again released Dutch onto Mr. Poulin.[26] At no point did any of the Defendant Officers attempt to stop Officer Walker's use of the K-9. Dkts. 30-1 & 30-2. Viewing the evidence and drawing all factual inferences in a light most favorable to Mr. Poulin, there is, at the very least, a genuine issue of material fact concerning whether the Defendant Officers were in a position to intervene. *See Velazquez v. City of Hialeah*, 484 F.3d 1340, 1342 (11th Cir. 2007) (finding that "testimony that two officers were present, coupled with their admission that they were present, permits the jury, if it believes that [the plaintiff] was beaten, to find that both of the officers administered the excessive force or that one beat him while the other failed to intervene"). Disposing of Plaintiff's failure to intervene claims at the summary judgment stage would therefore be inappropriate. They will instead be entrusted to the jury as trier of fact.

## II.    The City's Motion

The Court now turns to the City of North Port's Motion for Summary Judgment, Dkt. 61, on the two claims Mr. Poulin brings against it. The City maintains that it is entitled to summary judgment on Mr. Poulin's Count XIII § 1983 excessive force claim because Mr. Poulin cannot establish that the City is subject to

---

[26] Officer Hetteberg does not appear to be in the video footage until after Dutch was placed onto Mr. Poulin for the first time. Dkt. 30-1. Nevertheless, Officer Hetteberg was present when Officer Walker put Dutch on for the subsequent bite. *Id.*

municipal liability. *Id.* at 15−24. The City further posits that Mr. Poulin's Count XIV negligent retention and supervision claim concerning Officer Bush must fail because Officer Bush was acting within the scope of his employment during Mr. Poulin's arrest. *Id.* at 24−25. The Court begins by considering Mr. Poulin's § 1983 claim against the City.

### a. Section 1983 Excessive Force Claim

As the Supreme Court explained in *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), a municipality may only be held liable under § 1983 if the municipality itself caused the constitutional violation at issue. A successful *Monell* claim therefore requires a plaintiff to show that (1) his constitutional rights were violated, (2) the municipality had a policy or custom that constituted deliberate indifference to that constitutional right, and (3) the policy or custom caused the constitutional violation. *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)). The Court has already determined that Mr. Poulin has shown a violation of his Fourth Amendment rights through Officer Walker's excessive use of K-9 force, thereby satisfying the first element. The Court therefore considers whether Mr. Poulin has satisfied the remaining elements by showing a policy or custom and causation.

"A policy is a decision that is adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the

municipality." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997) (citation omitted). A custom, on the other hand, "is a practice that is so settled and permanent that it takes on the force of law." *Id.* (citation omitted). Where a plaintiff cannot show such a longstanding custom, a plaintiff may still establish a custom of excessive force using a ratification theory. When relying on a ratification theory, a plaintiff must demonstrate the municipality's "'persistent failure to take disciplinary action against officers' who use excessive force, which 'can give rise to the inference that the municipality has ratified the conduct[.]'" *Hawk v. Klaetsch*, 522 F. App'x 733, 736 (11th Cir. 2013) (quoting *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1443 (11th Cir. 1985)). Regardless of the selected method, demonstrating a custom requires a plaintiff to show "a persistent and widespread practice" of similar constitutional violations. *Id.*; *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1332 (11th Cir. 2007) (citation omitted). The City contends that Mr. Poulin cannot point to any policy or custom that would subject it to liability. Dkt. 61 at 16−22.

In response to the City's motion, Mr. Poulin maintains that he has shown a custom of excessive force through both a longstanding custom theory and a ratification theory. Dkt. 75 at 11−15. Concerning the former, Mr. Poulin asserts that the City has a longstanding custom of "permitting and encouraging the use of excessive force." *Id.* at 11. Mr. Poulin points to the following as evidence of this custom: news articles about the use of excessive force by Officer Bush and the

41

Department's K-9 unit; prior lawsuits against Officer Bush and the City for excessive force; expert opinions offered in those lawsuits; the deposition testimony of the Department's former Inspector, Steve Uebelacker; and Chief Vespia's decision to make Officer Bush a K-9 training officer despite the aforementioned evidence. *Id.* at 8−11.

The City asserts that the evidence cited by Mr. Poulin is insufficient to show a longstanding custom. Dkt. 81 at 3−4. The City first avers that the prior lawsuits cited by Mr. Poulin cannot show a persistent and widespread pattern of excessive force because Mr. Poulin has not shown that the lawsuits involved meritorious allegations of similar conduct. Dkt. 61 at 19−21; Dkt. 81 at 4. Where a plaintiff relies on a pattern of complaints of unconstitutional conduct to show a custom, the complaints must have merit. *See Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987). The complaints must also concern "factual situations that are substantially similar to the case at hand." *See Buckler v. Israel*, 680 F. App'x 831, 836 n.3 (11th Cir. 2017) (quoting *Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005)).

Here, though Mr. Poulin directs the Court to his Amended Notice of Related Actions in which he identifies several lawsuits against the City and/or its officers for excessive force, he has not shown that the underlying facts of those lawsuits are substantially similar to the facts before the Court. *See* Dkt. 75 at 9 n.3 (citing Dkt.

10). Mr. Poulin also does not dispute the City's assertion that the prior lawsuits did not result in final judgments on the merits. Merely identifying complaints of excessive force does not establish the merits of the same. *See, e.g.*, *Howard v. St. Johns Cnty. Sheriff by & through Const. of Fla.*, No. 3:20-cv-939-MMH-PDB, 2021 WL 4244132, at *10 (M.D. Fla. Sept. 17, 2021) (two prior lawsuits did not support alleged custom where facts of one lawsuit were not identified by plaintiff and facts of other lawsuit were distinguishable); *see also Brooks*, 813 F.2d at 1193 ("[T]he number of complaints bears no relation to their validity.").

The City also asserts that the Court is unable to consider the expert opinions offered in the past lawsuits. Dkt. 81 at 3. The Court agrees. The expert reports and opinions upon which Mr. Poulin relies were not made by any disclosed expert in this case. *See* Dkts. 73-7, 73-8, 73-9. Without proper expert disclosure under Federal Rule of Civil Procedure 26(a)(2), these expert reports and opinions are not admissible at trial and, consequently, are not to be considered at summary judgment.

Concerning the news articles cited by Mr. Poulin, the City posits that this evidence is inadmissible hearsay that may not be considered at summary judgment. *Id.* at 2–3. Indeed, news articles typically contain "multiple layers of hearsay," thereby rendering them inadmissible absent a hearsay exception. *Brooks v. Miller*, 158 F.3d 1230, 1242 (11th Cir. 1998). With Mr. Poulin failing to identify any hearsay exception, the Court may not consider the news articles for the truth of the

matters asserted therein. However, Mr. Poulin appears to contend that the Court may still consider the *effect* that the new articles had on the City. *See* Dkt. 75 at 8. Using the news articles in this way would not violate hearsay rules, as the news articles' effect on the City does not depend on the truth of any allegations. *See, e.g.*, *Fla. Right to Life, Inc. v. Mortham*, No. 19770CIVORL19A, 1998 WL 1735137, at *6 (M.D. Fla. Sept. 30, 1998) (considering news articles' effect). Instead, looking to their effect would show whether the City was familiar with the allegations of excessive force and, if so, appropriately investigated the matters.

Record evidence suggests that the City was aware of news articles' allegations of excessive force by the Department's officers. For example, Chief Vespia testified at his deposition that "news articles and lawsuits" prompted the creation of the Department's Inspector position for which Steve Uebelacker was hired in 2014. Dkt. 73-3 at 77. In this role, Mr. Uebelacker reviewed incidents of use of force and officers' Response to Resistance Reports. Dkt. 64 at 2. If Mr. Uebelacker "were to find any wrongdoing in his investigations, he was to complete a report that would be passed up to the Chief's attention for an internal affairs investigation." *Id.* Moreover, prior to the incident underlying the present case, Chief Vespia hired an outside use of force expert "to do policy review, use of force and response to resistance review, to train officers and to work with the Inspector on specific cases." *Id.*; Dkt. 73-19 at 6−7. These actions do not show a deliberate indifference to

allegations of excessive force.

To the extent that Mr. Poulin contends that Mr. Uebelacker's deposition testimony establishes otherwise, the Court disagrees. In his time "review[ing] every single use of force case," Mr. Uebelacker never found an instance of excessive force. Dkt. 73-5 at 84. He further testified that no K-9 bites took place during the time he served as the Inspector. *Id.* at 85−86. And while Mr. Uebelacker testified to his concerns surrounding Officer Bush's involvement with the K-9 unit, Mr. Uebelacker admitted that he did not have specific knowledge about "sustained complaints against [Officer] Bush and other K-9 officers." Dkt. 73-5 at 26−27, 46−47. In fact, Mr. Uebelacker never submitted a written request for an internal investigation into any incident of Officer Bush's K-9 handling. *Id.* at 88. Though Mr. Uebelacker may have had genuine concerns of Officer Bush's fitness as a K-9 officer or K-9 training officer, his testimony does not establish the City's deliberate indifference to any meritorious and substantially similar allegations of excessive force.

The Court is finally left to consider Chief Vespia's decision to make Officer Bush a K-9 training officer. Conflicting testimony is offered to explain why Officer Bush was removed from the K-9 unit and placed in a K-9 training officer role. According to Mr. Uebelacker, Officer Bush was removed from the K-9 unit due to command staff's concerns with his use of force. Dkt. 73-5 at 42−43. However, Chief Vespia and Officer Bush testified that Officer Bush was removed from the K-9 unit

for other reasons, including missing a court date. Dkt. 73-2 at 13; Dkt. 73-3 at 77−78. Chief Vespia further denied that Officer Bush's placement in the trainer position constituted a promotion from the K-9 unit. Dkt. 73-3 at 100.

However, even if Mr. Uebelacker's version of events is correct, no reasonable jury could find that this shows a longstanding custom of permitting and encouraging excessive force absent evidence that Officer Bush did, in fact, engage in instances of excessive force. As explained above, Mr. Poulin has not presented sufficient evidence that would permit such a finding. The prior lawsuits and news articles cited by Mr. Poulin cannot establish a pattern of excessive force by Officer Bush or the K-9 unit as a whole. Mr. Poulin provides insufficient information about the lawsuits to show that they concerned substantially similar facts, and the Court cannot consider the news articles for the truth of the matters asserted therein. The Court also cannot consider the expert reports and testimony offered in the past lawsuits, as those experts were not disclosed in this case. Moreover, Mr. Uebelacker's testimony does not support a finding of a widespread practice of excessive force by Officer Bush or the K-9 unit. Mr. Uebelacker himself stated that he did not identify any instances of excessive force while working as the Department's Inspector and did not have knowledge of sustained complaints Officer Bush or any of the other Defendant Officers.

Whether considered separately or in sum, the evidence identified by Plaintiff

fails to show a genuine issue concerning the existence of a longstanding custom of permitting and encouraging excessive force within the K-9 unit. No reasonable jury could find that the City had a "persistent and widespread practice" of permitting and encouraging excessive force within the Department's K-9 unit that was "so settled and permanent that it [took] on the force of law." *See Goebert*, 510 F.3d at 1332; *Sewell*, 117 F.3d at 489.

Mr. Poulin's ratification theory fairs no better. The evidence upon which Mr. Poulin relies is insufficient to show the City's "persistent failure to take disciplinary action against its officers who use excessive force," as Mr. Poulin "cannot point to a widespread practice of excessive force to begin with[.]" *See Hawk*, 522 F. App'x at 736 (internal quotes omitted); *see also Goebert*, 510 F.3d at 1332. As explained above, Mr. Poulin has not established that the prior lawsuits involved meritorious and substantially similar allegations, and the Court cannot consider the news articles for the truth of the matters asserted therein. Additionally, the expert opinions offered in the past lawsuits are inadmissible. Though Mr. Poulin relies on Mr. Uebelacker's testimony, Mr. Uebelacker himself admitted to never finding an instance of excessive force during his use of force reviews and having no specific knowledge of sustained complaints against Officer Bush or the other Defendant Officers. With no showing of a widespread practice of the K-9 unit's excessive use of force, Mr. Poulin's ratification theory fails.

Even if Mr. Poulin had demonstrated that a genuine issue remains regarding the existence of a custom of excessive force, he has not established the final element needed to subject the City to liability under § 1983: causation. A plaintiff must establish causation by showing that the municipality's custom was the "moving force" behind the plaintiff's injury. *McDowell*, 392 F.3d at 1292 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty, Okla. v. Brown*, 520 U.S. 397, 404 (1997)). In recognizing this onerous standard, the Supreme Court has explained that any lesser standard "would open municipalities to unprecedented liability under § 1983." *See City of Canton*, 489 U.S. at 391.

Here, Mr. Poulin asserts that Officer Bush "encouraged unnecessary force" by telling Officer Walker to retrieve K-9 Dutch "in a situation and circumstance where the use of a dog was not warranted." Dkt. 75 at 14. The only evidence of this encouragement is Mrs. Poulin's disputed testimony that Officer Bush told Officer Walker to "go get the dog." *See* Dkt. 73-15 at 18−19. Even if Officer Bush directed Officer Walker to retrieve Dutch, there are no allegations that Officer Bush *actually instructed* Officer Walker to release Dutch onto Mr. Poulin. Moreover, there is no evidence that Officer Bush inappropriately trained Officer Walker as Walker's K-9 training officer. No reasonable jury could find that the City had a custom constituting the moving force behind Officer Walker's excessive use of force.

For these reasons, the City is entitled to summary judgment on Mr. Poulin's

§ 1983 excessive force claim.

### b. Negligent Retention and Supervision Claim

The Court next turns to Count XIV, in which Plaintiff alleges that the City is liable for the negligent retention and supervision of Officer Bush. Under Florida law, "negligent supervision and retention occurs when, during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further action such as investigation, discharge, or reassignment." *Muegge v. Heritage Oaks Golf & Country Club, Inc.*, No. 8:05-CV-354-T-24 MAP, 2006 WL 1037096, at *8 (M.D. Fla. Apr. 19, 2006) (quoting *Garcia v. Duffy*, 492 So. 2d 435, 438−39 (Fla. 2d DCA 1986)).

A claim for negligent retention and supervision requires an employee's wrongful conduct to have been committed outside the scope of employment. *Buckler*, 680 F. App'x at 834 (first citing *Mallory v. O'Neil*, 69 So. 2d 313, 315 (Fla. 1954); and then *Delaurentos v. Peguero*, 47 So. 3d 879, 882 (Fla. 3d DCA 2010)). If a plaintiff alleges, and the defendant agrees, that the defendant's conduct was performed within the scope of employment, employer liability can only be pursued on a respondeat superior theory, not a negligence theory. *Delaurentos*, 47 So. 3d at 882 (citing *Mallory*, 69 So. 2d at 315). The term "scope of employment" is understood in this context to refer to the employee's job duties. *Yule v. Ocean Reef*

*Comty. Ass'n*, No. 19-10138-CIV-MORENO, 2020 WL 3051505, at *10 (S.D. Fla. June 8, 2020) (first citing *Acts Ret.-Life Comtys. Inc. v. Estate of Zimmer*, 206 So. 3d 112, 116−17 (Fla. 4th DCA 2016); then *City of Boynton Beach v. Weiss*, 120 So. 3d 606, 610 (Fla. 4th DCA 2013)).

Here, the City contends that Mr. Poulin's negligent retention and supervision claim necessarily fails because Officer Bush was acting within the scope of his employment during his encounter with Mr. Poulin. Dkt. 61 at 24−25. Indeed, Mr. Poulin specifically alleges in his Second Amended Complaint that "[a]t all times material hereto, the acts and omissions of Defendants were committed within the course and scope of their employment as North Port Police Department Officers." Dkt. 30 at 3. This allegation is buttressed by the parties' Joint Statement of Undisputed Facts, in which the parties agreed that Officer Bush "at all times relevant to these proceedings was performing his official functions as an officer for the City of North Port." Dkt. 64 at 6.

Even if the Court were to overlook Mr. Poulin's pleading, there is no genuine dispute that Officer Bush was acting within the scope of his employment (i.e., performing his job duties) while facilitating the arrest of Mr. Poulin. Contrary to Mr. Poulin's assertions, *see* Dkt. 75 at 19, allegations that Officer Bush may have acted outside the scope of his employment during *other* instances in his career does not save Mr. Poulin's own negligent retention and supervision claim. The City is

therefore entitled to summary judgment on Count XIV.

## CONCLUSION

Based on the foregoing, the Defendant Officers' Motions for Summary Judgment (Dkts. 56, 57, 58, 59, 60, 65) are **GRANTED-IN-PART** and **DENIED-IN-PART**. With respect to Mr. Poulin's § 1983 excessive force claims against the Defendant Officers, all but Officer Walker's Motion for Summary Judgment are granted. Officer Walker's Motion for Summary Judgment on excessive force is denied, he will face a jury on that count. With respect to Mr. Poulin's 1983 failure to intervene claims, all but Officer Walker's Motion for Summary Judgment are denied; the other Defendant Officers will face a jury for failure to intervene. The City's Motion for Summary Judgment (Dkt. 61) is **GRANTED** and judgment will be entered for the City. The Clerk is directed to enter judgment accordingly.

**DONE AND ORDERED** at Tampa, Florida, on January 13, 2023.

_/s/ William F. Jung_____
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
Counsel of Record